Leonard E. CASSELLA, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 04–1524C.

United States Court of Federal Claims.

Oct. 19, 2005.

Gordon C. Lane, Charleston, WV, attorney of record for plaintiff.

Dawn S. Conrad, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant. David M. Cohen, Director and Donald E. Kinner, Assistant Director. Victoria O'Brien of counsel.

## OPINION & ORDER

FUTEY, Judge.

This case comes before the court on defendant's motion for judgment upon the administrative record seeking to dismiss plaintiff's complaint. Plaintiff's complaint requests that this court overturn the Department of Justice, Office of Justice Programs, Bureau of Justice Assistance ("BJA") decision denying plaintiff benefits under the Public Safety Officer's Benefit Act ("PSOB"), 42 U.S.C. § 3796. Plaintiff cross-moves for a judgment on the administrative record as well. Defendant claims that the decision of the BJA should be upheld because it substantially complied with the statute and implementing regulations, it was not arbitrary or capricious, and there was substantial evidence supporting the decision. Defendant avers that the BJA correctly found that plaintiff's wife was not a public safety officer as defined under the PSOB because she was not involved with crime prevention or reduction, and, therefore, plaintiff is not entitled to any death benefits under the statute. Defendant maintains that, in the alternative, plaintiff is not entitled to the death benefit because plaintiff's wife was not killed "in the line of duty." Plaintiff asserts that the decision of the BJA was arbitrary and capricious because under West Virginia statute, plaintiff's wife was a police officer with arrest powers, and, therefore, was a law enforcement officer as contemplated under the PSOB. Petitioner also maintains that his wife was killed in the line of duty because she was performing her assigned duties at the time of her death.

### Factual Background

Mildred Cassella was employed by the City of Weirton, West Virginia as a "Special School Zone Police Officer" for seven years before her death. Mrs. Cassella held this position pursuant to West Virginia Code § 8–14–5 which provides:

Every municipality shall have plenary power and authority to provide by ordinance for the appointment of special school zone police officers, who shall have the duty of controlling and directing traffic upon designated parts of the streets, avenues,

roads, alleys or ways at or near schools, and who, in the performance of such duty, shall be vested with all the powers of local police officers. Such special school zone police officers shall be in uniform, shall display a badge or other sign of authority, shall serve at the will and pleasure of the appointing authority, and shall not come within the civil service provisions of this article or the policemen's pension and relief fund provisions of article twenty-two of this chapter. The governing body of the municipality may require such special school zone police officers to give bond, payable to the municipality, in its corporate name, with such sureties and in such penalty as the governing body may see fit, conditioned for the faithful performance of their duties.

According to her supervisor at the time, the Chief of the Weirton Police Department, Mrs. Cassella was the "face of the police" and "the figure of authority" when she was on duty.[1] Mrs. Cassella's primary duty as a Special School Zone Police Officer was to act as a crossing guard, directing traffic for school buses and children crossing the street. Mrs. Cassella would also report any traffic violations she observed in her area to the police. In addition, Mrs. Cassella had "indirect arrest power" in that she could report any crimes she witnessed while she was on duty to the police and an arrest would follow. Specifically, Mrs. Cassella's duties included intervening and reporting to police if she witnessed any problems among the children, such as bullying. Mrs. Cassella was also generally responsible for looking after the welfare of the children at her crossing, including reporting any child abuse or persons suspected of preying on children. Nevertheless, she was not equipped with a firearm or walkie-talkie, nor had she attended training at a police academy.

On the afternoon of April 12, 2002, Mrs. Cassella entered the intersection to which she was assigned in order to control the traffic flow so that a school bus could pull away from the curb. As was her usual practice, Mrs. Cassella stood in the intersection wearing her police department issued orange vest, holding her stop sign, and blowing her whistle in order to direct traffic. While standing in the eastbound traffic lane, Mrs. Cassella was struck by a sports utility vehicle ("SUV") traveling east. She was thrown onto the hood of the automobile and then slid down the front of the SUV. She was then dragged under the vehicle approximately thirty-eight feet and run over before being dislodged. Mrs. Cassella was taken by ambulance to the local hospital where she was pronounced dead.

Mrs. Cassella is survived by three grown children and her husband, plaintiff Leonard Cassella. Following her death, Mr. Cassella applied for and received Worker's Compensation Benefits from the State of West Virginia because Mrs. Cassella was a police officer killed in the line of duty. Mr. Cassella also applied to the Department of Justice Public Safety Officers' Benefits Program to receive the federal statutory death benefit available to public safety officers killed in the line of duty under the PSOB. Mr. Cassella's claim was denied by the BJA in May 2003 on the basis that Mrs. Cassella was not a law enforcement officer as contemplated under the statute and, in the alternative, she did not die "in the line of duty." Mr. Cassella then filed an appeal with the BJA, and a hearing was held on February 26, 2004 in order to present additional evidence as to whether Mrs. Cassella was, in fact, a law enforcement officer and whether she was killed "in the line of duty." The hearing officer held that Mrs. Cassella was not a law enforcement officer nor was she acting "in the line of duty" at the time of her death. On October 6, 2004, Mr. Cassella filed a complaint with this court appealing the hearing officer's decision. The court stayed proceedings in order to allow Mr. Cassella to perfect an appeal of the hearing officer's decision to the BJA. The BJA issued a final decision adopting the hearing officer's findings and denying benefits on April 28, 2005. Accordingly, the court reinstated the proceedings on May 17, 2005. Defendant filed a motion for judgment on the administrative record on June 23, 2005, and plaintiff filed his cross-motion for judgment on the administrative record on July 28,

1. *Admin. Rec. Ex. 6 at 43.*

2005. All responses and replies were filed by August 31, 2005.

## Discussion

■ The court must evaluate the decision of the BJA under the analytic framework set forth in the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Chacon v. U.S.,* 48 F.3d 508, 511 (Fed.Cir.1995). The *Chevron* court held that:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–843, 104 S.Ct. 2778. Therefore, this court must examine whether the BJA decision in this case was a reasonable interpretation of the PSOB and substantially complied with the regulations promulgated under the PSOB. *See Chacon,* 48 F.3d at 512.

Under the PSOB, 42 U.S.C. § 3796(a), "[i]n any case in which the Bureau of Justice Assistance ... determines, under regulations issued pursuant to this subchapter, that a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty, the Bureau shall pay a benefit of $250,000 ...." A public safety officer is defined as "an individual serving a public agency in an official capacity, with or without compensation, as a law enforcement officer, ...." 42 U.S.C.

§ 3796b(8)(A). A law enforcement officer is further defined as "an individual involved in crime and juvenile delinquency control or reduction, or enforcement of the laws, including, but not limited to, police, corrections, probation, parole, and judicial officers." 42 U.S.C. § 3796b(6).

Mrs. Cassella's status as a "public safety officer" under the PSOB depends on whether she was serving "1) in a public agency; 2) in an official capacity; and 3) as a law enforcement officer" at the time of her death. *See Hawkins v. U.S.,* No. 04–1687C, 68 Fed.Cl. 74, 81, 2005 WL 2106228 at \*7 (August 31, 2005). It is undisputed that Mrs. Cassella was employed by the Weirton Police Department and that she did so in an "official" capacity as designated by West Virginia law. The issue lies in whether she was a "law enforcement officer" under the PSOB.

Defendant argues that Mrs. Cassella does not qualify as a law enforcement officer under the PSOB because her duties were primarily to protect the welfare of children at her intersection, not to enforce criminal laws. Defendant cites to the facts that Mrs. Cassella did not have direct arrest powers, did not carry a firearm, and was not a sworn officer. Defendant also points out that Mrs. Cassella was not trained as a police officer. Defendant avers that the PSOB was not intended to cover persons, such as Mrs. Cassella, whose responsibility is to ensure public safety but who have no official ability to respond to criminal acts or juvenile delinquency.

Plaintiff contends that under West Virginia law, cited above, Mrs. Cassella was a law enforcement officer as contemplated by the PSOB. Plaintiff argues Mrs. Cassella was a police officer with all of the powers of local police officers while she was acting as a Special School Zone Police Officer, as stated by her supervisor, the former Chief of the Weirton Police Department.[2] Plaintiff also claims that Mrs. Cassella was "involved in" the enforcement of criminal laws, as indicated in the PSOB, because she was responsible for enforcing traffic laws, many of which were criminal laws, and enforcing laws preventing crimes against children, such as

---

**2.** *Admin. Rec. Ex. 6 at 66*

abuse. Plaintiff further argues that Mrs. Cassella was "involved in" juvenile delinquency control and reduction in that she reported and could intervene if she witnessed any instances of potentially delinquent behavior by the children at her crossing.

Although plaintiff and defendant present arguments regarding whether Mrs. Cassella's duties included the enforcement of criminal laws, this is ultimately irrelevant. Instead, the central question here is whether the PSOB was enacted to provide benefits only to the families of those whose sworn duty it is to enforce *criminal* laws, or to the families of officers whose responsibility is to enforce public safety laws in general. In *Hawkins v. U.S.*, this court overturned a BJA decision that a member of a sheriff's mounted posse was not a "law enforcement officer" under the PSOB. *See Hawkins*, 68 Fed.Cl. at 83, 2005 WL 2106228 at *9. The *Hawkins* plaintiffs were two family members[3] of a volunteer deputy sheriff. The deputy's responsibilities included "social and ceremonial activities, search and rescue, protection and preservation of property, participation in fund raisers, mounted crowd control, and traffic direction and control." *Id.* The BJA found that the volunteer deputy sheriff was not involved in enforcing criminal laws and therefore not a "law enforcement officer" under the PSOB. *Id.* at 80. The *Hawkins* court held that the BJA's decision was incorrect because "Congress did not define a 'law enforcement officer' to exclude those who enforce civil laws." *Id.* at 83.

In its final determination in the case at bar, the BJA stated that since the program was created it has interpreted the PSOB to only confer benefits on the families of those involved in enforcement of *criminal* laws.[4] Moreover, in rendering the decision ultimately adopted by the BJA, the hearing officer referred to PSOB regulation 28 C.F.R.

§ 32.2(m), which defines a law enforcement officer as an "individual involved in crime and juvenile delinquency control or reduction, or enforcement of the *criminal* law," (emphasis added) as a basis for rejecting plaintiff's claim. Defendant here did not cite to this regulation in its brief, but argues that the PSOB "only makes sense if read in light of the purposes of crime control, reduction or enforcement of criminal law ...."[5]

Although the *Hawkins* court did not specifically address 28 C.F.R. § 32.2(m), it is apparent that this regulation is an invalid restriction of the statute. Moreover, the BJA's determination that the PSOB makes sense only if it confers benefits on the families of officers specifically involved in criminal law enforcement is contrary to law as well as arbitrary and capricious. The PSOB defines a law enforcement officer as "an individual involved in crime and juvenile delinquency control or reduction, or enforcement of the laws, including, but not limited to, police, corrections, probation, parole, and judicial officers." 42 U.S.C. § 3796b(6). The word "criminal" is not present in the middle phrase "enforcement of the laws." If Congress had intended to limit the PSOB solely to those charged with enforcing criminal laws, it would have said so, as it did in the first phrase "involved in crime and juvenile delinquency control or reduction." In addition, it appears clear from the legislative history that Congress wanted to prevent the possibility that an officer killed while enforcing non-criminal laws would not be covered by the statute. *See* 122 Cong. Rec. 22644 (1976) (expressing concern that without the Senate amendments to the House of Representatives version of the PSOB the act would be too narrow and would exclude a number of deserving officers, such as "the police officer who is [killed while] directing traffic"). The BJA's insertion of "criminal" in the mid-

---

3. The *Hawkins* plaintiffs were the husband and minor daughter of the deceased. Under the PSOB, the death benefit is awarded to a deceased officer's surviving spouse and/or dependent children in equal shares. *See* 42 U.S.C. § 3796(a)(1–3), § 3796b(3). If the officer is not survived by a spouse or dependent children, the benefit will be awarded to the officer's designated beneficiary under his or her most recent life insurance policy. 42 U.S.C. § 3796(a)(4). If the

officer did not designate any such person, the benefit will be awarded to the officer's parent or parents in equal shares. 42 U.S.C. § 3796(a)(5).

4. *Admin. Rec. Ex. 11 at 5.*

5. *Def.'s Mot. for Judgment upon the Admin. Rec. at 8.*

dle phrase is an impermissible construction of the statute and is, therefore, not entitled to *Chevron* deference.[6]

**■** Therefore, in order to find that Mrs. Cassella was a "law enforcement officer" under the PSOB, the court must determine if her responsibilities as a Special School Zone Police Officer included "enforcement of the laws," whether criminal or other. Like the *Hawkins* plaintiff, Mrs. Cassella's responsibilities included enforcing non-criminal laws, namely traffic laws, and Mrs. Cassella was also an official member of the Weirton Police Department, as testified to by her supervisor and evidenced by plaintiff's receipt of worker compensation benefits from the state.[7] Further, Mrs. Cassella was responsible for the welfare of the children in her crossing zone, including intervening if she witnessed any episodes of juvenile delinquency or child abuse. Therefore, Mrs. Cassella was "involved in" the enforcement of the laws and, consequently, was a public safety officer under the PSOB. The plaintiff is thus entitled to any and all benefits available to him under the statute.

**■** Defendant also contends that even if Mrs. Cassella was, in fact, a public safety officer under the PSOB, she was not acting "in the line of duty" at the time of her death. Under Department of Justice regulation, the "line of duty" standard is defined as:

> Any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is obligated or authorized by rule, regulations, condition of employment or service, or law to perform, including those social, ceremonial, or athletic functions to which the officer is assigned, or for which the officer is compensated, by the public agency he serves. For other officers, "line of duty" means any action the

officer is so obligated or authorized to perform in the course of controlling or reducing crime, enforcing the criminal law, or suppressing fires.

28 C.F.R. § 32.2(c)(1). Defendant argues that because Mrs. Cassella's primary function was directing traffic, in order for her death to have occurred "in the line of duty" she must have been performing crime control activities when she was killed. Defendant avers that because Mrs. Cassella was directing traffic at the time of her death and not enforcing any criminal laws, her death was not "in the line of duty." Further, the BJA rejected a similar claim by a crossing guard on the basis that directing traffic was not enforcement of criminal laws, and, therefore, the crossing guard did not die "in the line of duty."

Plaintiff, on the other hand, argues that Mrs. Cassella was killed "in the line of duty" citing the legislative history as an indication that Congress intended deaths such as Mrs. Cassella's to be covered by the PSOB. Plaintiff relies primarily upon statements made during the PSOB Senate debates that without the Senate amendments to the House of Representatives' version of the PSOB, the act would be too narrow and would exclude a number of deserving officers, such as "the police officer who is [killed while] directing traffic." 122 Cong. Rec. 22644 (1976). The act was ultimately adopted with the Senate's amendments. Plaintiff further argues that Mrs. Cassella was killed while she was performing her official duties and responsibilities, and, thus, her death was "in the line of duty."

In *Hawkins*, this court held that the regulation cited by defendant is invalid because it impermissibly narrows the scope of the "in the line of duty" requirement. *See Hawkins*, 68 Fed.Cl. at 83, 2005 WL 2106228 at *10.

---

**6.** Defendant cautions that a broad reading of the definition of "law enforcement officer" would defeat the purpose of the PSOB because it would cause the definition to include "anyone with any tenuous connection to criminal law enforcement, including neighborhood watch members or private citizens who report suspicious criminal activity to law enforcement authorities." *Def.'s Mot. for Judgment on the Admin. Rec. at 7.* This is incorrect, however, because the definition of

public safety officer includes "an individual serving a public agency in an official capacity . . . ." 42 U.S.C. § 3796b(8)(A). A law enforcement officer is merely a type of public safety officer, and so can not be merely a watchful citizen, because to receive benefits, a law enforcement officer must also be officially part of a public agency.

**7.** *Admin. Rec. Ex. 6 at 66.*

Specifically, this court found that the regulation improperly confines the PSOB benefits to families of law enforcement officers killed while enforcing criminal laws, something Congress declined to do. *Id.* Instead, the express intent of Congress was to confer benefits on the family of any officer enforcing the laws, whether civil or criminal, at the time of his or her death. *Id.* With regard to the case at bar, as mentioned above, the Senate debates even included reference to the exact situation here—an officer killed while directing traffic. 122 Cong. Rec. 22644 (1976). The *Hawkins* court, therefore, concluded that because the regulation is "contrary to the law, as well as arbitrary and capricious, it is entitled to no deference." *Id.*

It is undisputed that at the time of her death, Mrs. Cassella was enforcing traffic laws. Under the PSOB, because she was a law enforcement officer performing her official duties at the time of her death, she was killed "in the line of duty." Therefore, plaintiff is entitled to any and all benefits available to him under the PSOB.

### Conclusion

For the above-stated reasons, defendant's motion for judgment on the administrative record is DENIED and plaintiff's cross-motion for judgment on the administrative record is GRANTED. The Clerk of the Court is directed to enter a judgment in favor of plaintiff in the amount of $250,000 under the Public Safety Officer's Benefit Act.

IT IS SO ORDERED.